***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and oral arguments before the Full Commission. Upon review of all of the competent evidence of record with references to the errors assigned and finding good grounds to receive further evidence, the Full Commission filed an Interlocutory Opinion and Award on December 28, 2004 in which plaintiff was found to have sustained a compensable injury by accident on October 16, 2001. In the Order portion of the Interlocutory Opinion and Award, the Commission reopened the record to receive additional medical evidence consisting of the medical records of Charlotte Orthopedic Specialists and Dr. Thomas Fehring. Defendants filed an appeal to the North Carolina Court of Appeals from the Interlocutory Opinion and Award of December 28, 2004. However, the parties proceeded to depose Dr. Fehring. On May 9, 2005, defendants also filed with the Commission a motion to reconsider and a motion to stay. The Commission declined to rule on these motions, in that the Commission had no jurisdiction over the matter then pending at the Court of Appeals. Defendants moved to withdraw their appeal to the Court of Appeals and by Order filed May 25, 2005, Commissioner Pamela T. Young allowed withdrawal of the appeal.
The case is now ready for a final decision by the Commission. Upon consideration of all the evidence of record, the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. Employee is Crystal McWhirter.
2. Employer is Phillips Staffing, Inc., a temporary agency that placed plaintiff at Pass Seymour.
3. The carrier on the risk for Phillips Staffing, Inc., was The PMA Insurance Group.
4. An employee-employer relationship existed between Phillips Staffing, Inc., and plaintiff.
5. Plaintiff's average weekly wage was $264.32, yielding a compensation rate of $176.22.
6. Plaintiff's alleged date of injury by accident was October 16, 2001.
7. Defendant-employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act.
8. The following exhibits were entered into the evidence of record at the hearing before the Deputy Commissioner.
a) Stipulated Exhibit 1 — Pre-trial agreement
b) Stipulated Exhibit 2 — medical records
c) Stipulated Exhibit 3 — I.C. Forms
d) Stipulated Exhibit 4 — incident report
e) Stipulated Exhibit 5 — statement of Ralph Smith
9. The depositions and records of Dr. Richard Avioli and Dr. Thomas Fehring and the records of Charlotte Orthopedic Specialists are a part of the evidence of record.
10. The issues before the Commission are whether plaintiff's injury at work entitles her to compensation under the Workers' Compensation Act, and, if so, to what benefits plaintiff is entitled.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was thirty years old and completed the tenth grade of high school. Plaintiff has worked in various mills, including Pharr Yarns, China Grove, JPS, Threads, and Pass Seymour, and has also been a waitress.
2. On June 11, 2001, plaintiff was hired at Pass Seymour through the temporary agency, Phillips Staffing, defendant-employer.
3. Plaintiff's job at Pass Seymour was packing wall plates, which required plaintiff to sit and stand while she inspected electrical wall plates. Plaintiff packed 20 plates per box and then packed seven of these small boxes into a larger box, taped the boxes shut and stacked them on a pallet. The heaviest item plaintiff was required to lift weighed approximately 30 pounds.
4. Plaintiff's prior medical history was unremarkable except for injuries plaintiff sustained in an automobile accident on November 9, 1998, when she suffered a collapsed lung, broken ribs and fractured skull after she struck the windshield of the vehicle.
5. Approximately one week before October 8, 2001, plaintiff began to experience pain associated with her right groin area. Plaintiff testified that she pulled her right groin muscle while either attempting to put on a tight pair of blue jeans or by moving boxes at home or at work. Plaintiff never reported any incident to her employer, as plaintiff did not think that she had hurt her groin at work. Plaintiff continued to work until October 8, 2001 when she went to see her family physician, Dr. Charles Lowery.
6. On October 8, 2001, plaintiff presented to Dr. Lowery with complaints of pain in her right groin area. Based upon his examination, Dr. Lowery noted tenderness and pain associated with movement of plaintiff's right leg. Dr. Lowery recommended that plaintiff apply heat, continue taking Paxil, and wrote plaintiff out of work for one week.
7. After plaintiff had been out of work for one week, as authorized by Dr. Lowery, plaintiff was allowed to return to work. Plaintiff returned to work on October 15, 2001 to start her shift at 11:00 p.m. Plaintiff had previously requested permission from Pass Seymour to be able to return to work using crutches and was given approval to do so. It was understood that plaintiff was going to be able to perform her work by sitting down.
8. On October 15, 2001, plaintiff drove herself to work and walked into the plant on her crutches. Plaintiff's supervisor, Kevin Garrison, testified that he saw plaintiff in the parking lot on crutches and that he allowed her to go to work using her crutches. Plaintiff worked two hours until approximately 1:00 a.m., when she went on her first break. Plaintiff walked toward the exit, which led to the smoking area. Ralph Smith, plaintiff's co-worker, was walking with plaintiff. Plaintiff was using crutches as she walked toward the exit. Once plaintiff and Mr. Smith got near the exit door, Mr. Smith stepped in front of plaintiff to open the door. At that time plaintiff's left crutch slipped out from under her and plaintiff fell straight to her knees and then rolled forward. At the time plaintiff's knees hit the ground, she felt and heard a pop in her right hip and immediately felt pain. Mr. Smith turned around and saw plaintiff's crutch sliding out and plaintiff rolling forward. Mr. Smith helped plaintiff into the smoking area.
9. In the smoking area, plaintiff attempted to smoke a cigarette, continued to experience pain, and noted to Mr. Smith that something was just not right. It was then that plaintiff was placed upon a rolling cart by Mr. Smith and another co-worker and rolled to Mr. Garrison's office. There, plaintiff met with Mr. Garrison and Roger Lynn McWhirter, plaintiff's co-worker and father-in-law. Both Mr. Garrison and Mr. McWhirter observed that plaintiff definitely appeared to be in pain. Even though plaintiff was offered medical care, she chose to go home instead. Mr. McWhirter brought plaintiff's car around and then helped pick her up to place her in the car. As plaintiff was being placed into her car by Mr. McWhirter, she yelled out in pain.
10. Following her injury, plaintiff continued to experience severe pain. Due to her continued severe pain, plaintiff was taken to the emergency room at Gaston Memorial Hospital.
11. Plaintiff was examined at the emergency room by Dr. Timothy J. Carr on October 17, 2001 at 9:17 a.m., and presented with complaints of severe right hip pain. Dr. Carr diagnosed plaintiff with right femoral neck fracture. Dr. Carr noted that the history he was given on plaintiff's injury was that she was at work on crutches, and that her crutches slid out, hyper-extending her hip and causing immediate pain in her right hip.
12. Emergency room x-rays were taken of plaintiff's right hip on October 17, 2001, and the x-rays showed that plaintiff had a displaced femoral neck fracture.
13. Following the results of her x-rays, plaintiff was next examined by Dr. Richard C. Avioli, a board-certified orthopedic surgeon, at the emergency room. In his preoperative admission history and physical examination report, Dr. Avioli noted that plaintiff had returned to work on crutches and slipped and fell, hyperextending her right hip. Plaintiff reported feeling immediate pain and a pop in her hip, and extreme pain in the right hip since her fall at work. As the result of the fall, plaintiff had a displaced femoral neck fracture. On October 17, 2001, Dr. Avioli performed surgery on plaintiff to correct the fracture. Plaintiff was discharged on October 19, 2001.
14. Dr. Avioli felt plaintiff's fall at work on October 16, 2001 when her crutch slipped out from under her caused plaintiff's displaced right hip fracture. In Dr. Avioli's opinion, lifting boxes approximately one month prior to her October 16, 2001 fall and injury at work could not have caused plaintiff's displaced right hip fracture. Dr. Avioli stated that the level of pain with a displaced fracture is severe and incapacitating and that plaintiff would not have been able to tolerate that level of pain for a month. Dr. Avioli felt it was more likely that plaintiff's injury was caused by trauma.
15. It was Dr. Avioli's opinion that the fracture he observed on the fluoroscopic images in surgery was a displaced femoral neck fracture that appeared to be acute. He explained that "it looked like a recent fracture just by the characteristics of jagged edges, no evidence of healing." Dr. Avioli testified that the most likely scenario was that plaintiff had an undisplaced fracture on October 8, 2001 and the fall to her knees on October 16, 2001 caused direct force and "extended the fracture so that it went from undisplaced to displaced."
16. Plaintiff was last seen by Dr. Avioli on February 11, 2002. At that time, Dr. Avioli continued plaintiff on restrictions of using crutches to walk and touch-down weight bearing on her right leg. Dr. Avioli also continued plaintiff out of work until her follow-up visit with him in three months on or about May 13, 2002. However, Dr. Avioli did not see plaintiff again after February 11, 2002 and he testified that he would have to examine plaintiff again in order to give her any current restrictions. Dr. Avioli stated that it was not unreasonable to expect plaintiff to continue having problems with her hip, because she was at risk for avascular necrosis of the hip and/or nonunion of the fracture due to the fact that the displaced femoral neck fracture was 48 hours old by the time he saw her in the emergency room.
17. Plaintiff testified that she did not return to Dr. Avioli or receive further medical treatment because she had no health insurance and her claim had been denied by defendants.
18. Plaintiff has not returned to work with defendants or with any other employer since October 16, 2001. Plaintiff has also not looked for any work since October 16, 2001. Plaintiff testified that she has not looked for work because she is unable to work due to the work-related right hip injury and her continued pain. Plaintiff stated that she continues to have pain in her hip, difficulty with movement, and pain when sitting or walking.
19. At the Deputy Commissioner's hearing, plaintiff did not present any further medical evidence that she was taken out of work or given work restrictions by any doctor since she last saw Dr. Avioli on February 11, 2002.
20. Plaintiff filed a motion with the Full Commission to reopen the record to receive additional medical evidence consisting of the medical records of Charlotte Orthopedic Specialists and Dr. Thomas Fehring, who treated plaintiff beginning in March 2004 following the close of the evidence of record before the Deputy Commissioner. Pursuant to N.C. Gen. Stat. § 97-85 and Rule 701(6) of the N.C. Workers' Compensation Rules, the Commission reopened the record to receive these medical records and to allow Dr. Fehring's deposition.
21. On February 17, 2004, plaintiff was seen by Dr. Patricia McHale at Charlotte Orthopedic Specialists. Dr. McHale ordered x-rays, which showed a nonunion of the right femoral neck fracture. Dr. McHale referred plaintiff to one of her partners, Dr. Thomas Fehring, an orthopedic surgeon, who first treated plaintiff on March 1, 2004. Plaintiff complained to Dr. Fehring of constant pain in her right hip of a severity of nine out of ten and stated that she required crutches to walk. Standing, walking and anything putting pressure on the right leg caused significant pain. Dr. Fehring reviewed recent x-rays and determined that plaintiff had a clear nonunion with displacement of her femoral neck fracture and ordered an MRI to rule out avascular necrosis.
22. On March 22, 2004, plaintiff returned to Dr. Fehring for follow-up after the MRI, which showed no avascular necrosis and a nonunion of the femoral neck fracture. On June 1, 2004, Dr. Fehring surgically removed the hardware in the right hip and ordered another MRI. Subsequently, on June 4, 2004, Dr. Fehring performed an open reduction internal fixation of the femoral neck and put in a plate and screws. Dr. Fehring expected the healing period to be three months following the surgery, during which plaintiff would have been restricted to using crutches.
23. Dr. Fehring did not see plaintiff from July 2, 2004 until April 15, 2005. At the April 15, 2005 appointment plaintiff was fully recovered. Dr. Fehring had no further treatment recommendations and stated that plaintiff was "doing great. She basically sprints down the hall." Dr. Fehring planned to check plaintiff in six months, with x-rays before being seen. Dr. Fehring did not mention any permanent functional impairment in the April 15, 2005 medical note.
24. At his deposition, Dr. Fehring stated that the condition he treated was causally related to the original fracture and that plaintiff's pain experienced between May 13, 2002 and February 2004 was consistent with a nonunion of the fracture. Dr. Fehring stated that from May 2002 through February 2004 plaintiff might have been able to work at a sitting job but not a standing job.
25. Upon review of the x-rays of plaintiff's hip taken on October 17, 2001, Dr. Fehring expressed his opinion that the fracture appeared to be chronic rather than acute because of the appearance of a tongue and groove look that would have taken more than 24 hours to develop. However, Dr. Fehring agreed that plaintiff had a displaced fracture at the time of her surgery by Dr. Avioli and that a displaced fracture would cause severe pain and make it difficult to move around and engage in activities. Dr. Fehring stated, "I don't think the fall on the 16th, if that was her only fall, okay, did what I saw totally on the x-ray of the 17th." When asked if the fall could have aggravated a preexisting condition, Dr. Fehring responded, "Well, it's hard to make a femoral neck fracture much worse. It's either broken or it isn't. So, yeah, I guess it could make it a little worse, but not a lot worse." He also stated "with certainty" that the fall on October 16, 2001 did not displace the fracture, based upon the keyed-in and callus formation which develops over time.
26. The Full Commission finds that plaintiff's testimony describing her October 16, 2001 fall, the medical history taken on October 17, 2001 describing plaintiff's fall at work, along with her October 23, 2001 work incident report, when taken as a whole, are consistent and support a finding that plaintiff sustained a slip and fall at work.
27. Plaintiff's slip and fall occurred when plaintiff was engaged in the performance of her work duties on defendant's premises and while she was taking a work-related smoke break, an authorized activity. Plaintiff's slip and fall caused her resulting injuries. The fact that plaintiff was ambulating to this smoke break area by use of crutches, which she was given permission to use at work, does not remove the causal connection between plaintiff's slip and fall and her employment.
28. The Commission gives greater weight to the causation opinions of Dr. Avioli, who treated plaintiff immediately after her fall and performed the first surgery to her hip, than to Dr. Fehring, who first treated plaintiff three years after her fall. Therefore, the Commission finds that plaintiff has shown by the greater weight of the evidence that she sustained an injury by accident arising out of and in the course of her employment on October 16, 2001, when she slipped and fell.
29. The greater weight of the medical evidence shows that as a result of her compensable injury to her right hip, plaintiff was disabled from any employment from October 16, 2001 until May 13, 2002. The evidence of record does not support any continuing disability after May 13, 2002, when plaintiff was capable of some work, including the job with defendant-employer that could be performed sitting. Plaintiff did not make any job search after May 13, 2002 and sought no medical treatment from February 11, 2002 until February 17, 2004. Neither Dr. McHale nor Dr. Fehring, when they began to treat plaintiff in February and March 2004, expressed an opinion as to plaintiff's ability to work. As of the first surgical procedure on June 1, 2004, plaintiff was again disabled and not capable of any work until September 1, 2004, three months following the surgery. After September 1, 2004, there is no evidence of record that plaintiff continued to be disabled from any employment. Plaintiff sought no further medical treatment from July 2, 2004 until April 15, 2005 when Dr. Fehring stated plaintiff was fully recovered.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of her employment on October 16, 2001, resulting in a right hip fracture. N.C. Gen. Stat. § 97-2(6).
2. Because plaintiff's claim was denied, plaintiff has the burden of proving disability, defined as a loss of wage earning capacity. Russell v.Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). In order to meet the burden of proving disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than her pre-injury wages. Demery v. Perdue Farms, Inc., 143 N.C. App. 259,545 S.E.2d 485 (2001); Russell v. Lowes Product Distribution, supra. When a plaintiff meets her burden of showing disability, the burden then shifts to defendant to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v.Perdue Farms, Inc., supra.
3. In the instant case, plaintiff met her initial burden to show that she was disabled. Plaintiff was unable due to her compensable injury to return to her regular job or to any employment from October 15, 2001 until May 13, 2002 and again from June 1, 2004 until September 1, 2004. Between May 13, 2002 and June 1, 2004 and again following September 1, 2004, the greater weight of the evidence fails to show that plaintiff was disabled. Plaintiff did not meet her burden to prove that during these time periods she was unable to obtain employment after a reasonable effort or that it was futile for her to seek employment because of other factors. She was capable of some work and no doctor took her out of work. N.C. Gen. Stat. § 97-29;Russell v. Lowes Product Distribution, supra.
4. As a direct and proximate result of plaintiff's October 16, 2001 injury by accident and her resulting medical conditions, plaintiff was disabled from any employment from October 16, 2001 until May 13, 2002 and from June 1, 2004 until September 1, 2004 and is entitled to temporary total disability compensation at the rate of $176.22 per week from October 16, 2001 until May 13, 2002 and from June 1, 2004 until September 1, 2004. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have defendants provide all medical treatment necessitated by her October 16, 2001 injury by accident to her right hip, including her October 17, 2001 and June 1 and 4, 2004 surgeries and further medical treatment. N.C. Gen. Stat. §§ 97-2(19), 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees approved below, defendants shall pay temporary total disability compensation to plaintiff at the rate of $176.22 per week from October 16, 2001 until May 13, 2002 and from June 1, 2004 until September 1, 2004. This amount has accrued and shall be paid in a lump sum.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury by accident for so long as may be reasonably required to effect a cure and give relief or lessen plaintiff's period of disability. The approved medical expenses include the surgeries on October 17, 2001 and June 1 and 4, 2004.
3. The issue of any permanent partial disability rating to plaintiff's leg is reserved for future determination.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs, including costs due for the testimony of expert witnesses.
This the 21st day of June 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/mlb